**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 19-MJ-194 (DAR)** |
| **BRENDON SPANN,** | |
| *Defendant.* | |

## UNITED STATES MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION

The United States of America, through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion for an Order detaining the defendant, Brendon Spann, pending trial, pursuant to 18 U.S.C. §§ 3142(f)(1)(A) and 3142(f)(2)(B).

The defendant was arrested after he stalked and threatened his ex-girlfriend (Hereinafter "Victim 1"), her family, her friends, their co-workers, and even Victim 1's family's co-workers for more than 18 months, beginning in November 2017 and culminating with his repeatedly expressed desire to kill her on July 24, 2019.  The communication has escalated in both content and obfuscation techniques including the use of the Tor network and other obfuscation websites and email providers to hide the identity of the sender.  During that time, he repeatedly threatened to kill his ex-girlfriend, himself, and others.

The government respectfully submits that the defendant should be detained pending trial, pursuant to 18 U.S.C. §§ 3142(f)(1)(A) and 3142(f)(2)(B).  The defendant has been charged with six crimes of violence, including three that involve a prolonged period of violent conduct, and there is a serious risk that, if the defendant is released, he will obstruct or attempt to obstruct justice.

## Procedural Background

On July 23, 2019, the defendant was charged by complaint with violations of 18 U.S.C. §§ 875 (Threats) and 2261A (Stalking).  On July 24, 2019, the FBI arrested the defendant.

At the defendant's initial appearance on July 24, 2019, the government orally moved for detention pursuant to 18 U.S.C. § 3142(f)(1)(A) and 18 U.S.C. § 3142(f)(2)(B), because the defendant has been charged with crimes of violence and poses a serious risk of obstruction of justice.  The Court ordered that the defendant be temporarily detained until the detention hearing scheduled for July 29, 2019.

On July 25, 2019, a grand jury returned an indictment charging the defendant with three violations of 2261A (Stalking), against Victims 1, 2, and 3, and 18 U.S.C. §§ 875 (Threats), against Victims 1, 2, and 4.  If the defendant were convicted on all counts, he would face a statutory maximum sentence of up to 20 years in prison.

## Factual Proffer of the Evidence Supporting the Charges

The defendant is a twenty-nine-year-old federal employee who has a degree in Information Systems from Bowie State University.  He also worked briefly for the National Security Agency (NSA).

In June of 2017, Victim 1 and the defendant ended an approximately two-year romantic relationship but attempted to remained friends until around November 2017.  Around that time, Victim 1 informed the defendant that she no longer wanted to communicate with him.  She then began to receive repeated unwanted text messages and phone calls from phone number (410) 562-2112, which she knew belonged to the defendant.  Sometime in or around November 2017, Victim 1 blocked the defendant's cell phone number.  According to records provided by AT&T, the

defendant has been the listed subscriber of the phone number (410) 562-2112 ("the defendant's cell phone number") from October 2014 until the present.

On November 2, 2017, using a work email address that contains her name, Victim 1 sent an email to the defendant telling him to stop contacting her and her coworkers. The defendant responded, "I don't know who you are, but I will be blocking you from contacting me. Please do not contact this email again." Approximately nine minutes later, the defendant emailed Victim 1 again stating, "As a representative of [Victim 1's place of work], you should not be sending these types of messages. Do you work under a Ms. [Victim 1's supervisor]?"

Then, Victim 1 began receiving calls from an unknown telephone number. When Victim 1 answered, she recognized the defendant's voice on the phone. Victim 1 again told the defendant to leave her alone or she would call the police. The defendant replied, "Call them. Have them shoot me." He added that he hoped that Victim 1 would get into a car accident and die.

On November 28, 2017, Victim 1 received three text messages from the phone number (240) 249-2613. Each read, "Liar," "Liar," "Lir [sic]." According to records provided by Ad Hoc Labs, Inc. (dba Burner), the defendant's cell phone number is listed as the "user" phone number for the Burner phone number (240) 249-2613 ("the defendant's Burner phone number"). The Burner account was created minutes before the texts were sent. Burner is a mobile application for iOS and Android created by Ad Hoc Labs, Inc. that allows users to create temporary disposable phone numbers that are anonymous.

Approximately three hours later, still on November 28, 2017, Victim 1 received text messages from the phone number (646) 760-2497, which she did not recognize, saying, "This one is running out of credits for texts too, just unblock me . . . I'll have to do something stupid . . . Just text my phone."

On November 29, 2017, Victim 1 received text messages from an unknown phone number, (240) 776-2574.  Victim 1 texted back, saying in part, "Stop harassing means stop!!  . . .  Brendon stop contacting me! . . . Just go ur [sic] own way!!"  The unidentified sender responded, "No problem, you set this up . . . Smh ("smh" is a common abbreviation used in text messages for "shaking my head") . . . Send me back anything I gave you . . . Are you sending it back?"  Starting at or around 2:59 PM, Victim 1 received text messages from the same phone number stating, "You should get some fresh air . . . Outside."  Approximately seven minutes later, Victim 1 received a screenshot of the Wi-Fi networks accessible to the phone at the unknown phone number.  One of the Wi-Fi networks appears to be the one associated with a Washington Metropolitan Area Transit Authority station near Victim 1's office.

On that same day, Victim 1 saw the defendant as she was driving out of the parking garage at her workplace.  The defendant approached her vehicle and pulled on her door handle.  Victim 1 kept the vehicle door locked and drove down the street, but the defendant attempted to keep pace with the vehicle on foot.  Victim 1 saw him again when she was stopped at a streetlight.  Within minutes of leaving the immediate area, Victim 1 received a text message from the same phone number stating, "Wtf."

Later that same day, Victim 1 received numerous anonymous phone calls and, at some point that night, an unknown individual rang the doorbell at her home several times and then fled.

According to Bandwidth, the phone number (240) 776-2574 belongs to a Google Voice account.  According to Google's records, Google issued the phone number on November 29, 2017, the same day Victim 1 received the texts and the defendant attempted to enter Victim 1's vehicle.  Such a voice over internet protocol (VOIP) phone number allows phone calls and text messages

to occur over the internet.  The phone number is registered to "Robert Smith" and connected to the

Google email account Tram912t@gmail.com.

On December 1, 2017, Victim 1 received an email from nobody@remailer.paranoici.org

saying:

> Stop doing this to me, you're scaring me.  How you gonna throw away someone
> and act like they don't exist?  You can't do that.  You act like I'm garbage . . . Who
> helped you just recently with your decision about your friend?  You know I give
> good advice. . . . Who makes you laugh with jokes? . . . Who took off from their
> job to accompany you for safety and drove hours with you? . . . Who checks up on
> your health? . . . Who helped you move out of your apartment in Baltimore? . . .
> Who gave you encourage to find an internship and now a job when you gave up
> your search and said you would just babysit forever?  I said keep trying and you
> landed them. . . .  Who was there in September when you were "devastated"
> romantically twice by another man (who was engaged to be married)? . . . You
> would turn your back on someone who did those things and much more?  Those
> things can't be erased, and you understand what I mean to you.  You will always
> think of me, and what we share.  Remember when you spent your tax refund on
> me?  That's love, that doesn't go away.  I just helped you this week, and now I'm
> the enemy?  How are you going to do the same things regarding your friend lying
> that you did after your affair in September: Try to use me for emotional comfort, I
> then solve your problem, and then you decide to not talk to me.  That's wrong to
> do.  You think somebody else would have put up with that stuff?  You threatened
> me with physical harm, and then we made up.  We're going to make up now.  It
> never stops with you.  Remember the Mariah Carey "Forever" song?  You said
> forever and sent that song, and now you're saying never.  I'm not a threat.  I stood
> by you, even when you did the things that you did.  How can you say I tortured
> you?  You've tortured me, and bring others into this.  Torture is telling people I hit
> you, when you were never hit.  That's slanderous.  Torture is making someone lose
> their job.  Torture is not being there for someone who was there for you.  You broke
> up with your last ex right around his birthday, that's torture.  You still cry about
> what you did to him, and you cry about what you're doing to me.  Don't make this
> situation like your last ex.  I'm not putting you down, but to say I tortured you is
> wrong.  Do the right thing and make up with me.  I have been there for you every
> time.  Other people don't understand what's going on.  Do not cut me out of your
> life, that shouldn't be done.  I'm the person that you love, the same person that I
> was when you met me and fell in love.  That "felinlovee" is a reference to me, and
> you know that.  I have moved past this whole situation, but I'm going to help you.
> We are going to talk again starting today and build.  Text my phone today and tell
> me what time we're going to have our phone conversation.

The email included a YouTube hyperlink to the Mariah Carey song "Forever."

Victim 1 confirmed the following information in reference to the above email message:

As to the portion of the email that reads, "Who helped you just recently with your decision about your friend?  You know I give good advice," Victim 1 reported that, in November 2017, her best friend (hereinafter known as Victim 3) posted a picture of Victim 1 on a public Twitter account.  Victim 3 said that she intended the post to promote the fact that Victim 1 was newly single.  Victim 1 was upset that Victim 3 posted her photo without Victim 1's permission.  Victim 3 claimed that the picture was posted for a short time before she took it down.  However, the defendant told Victim 1 that he was on Victim 3's Twitter page and knew the post was up for a longer period.  Victim 1 confronted Victim 3 with the information she received from the defendant.

As to the section of the email that reads, "Who took off from their job to accompany you for safety and drove hours with you?" Victim 1 stated that in 2015 or 2016, she had to travel to Blacksburg, Virginia for training.  The defendant accompanied her on the trip and he drove the entire way there.

As to the section of the email that reads, "Who checks up on your health?" Victim 1 reported that she was diagnosed with an autoimmune disease over 10 years ago and the defendant is aware of it.

As to the section of the email that reads, "Who helped you move out of your apartment in Baltimore?" Victim 1 reported that, in or around the spring of 2015, Victim 1 completed a certification through the University of Baltimore in Baltimore, Maryland.  After completing it, the defendant helped Victim 1 to move out of her Baltimore apartment.

As to the section of the email that reads, "Who gave you encourage to find an internship and now a job when you gave up your search and said you would just babysit forever?  I said keep trying and you landed them[.]"  Victim 1 reported that while she was completing her certification, she babysat for her niece to earn extra cash.  The defendant, who had several internships,

encouraged Victim 1 to apply for an internship.  In or around August 2016, Victim 1 landed an internship with an education council in Washington, DC.  This internship eventually led to a full-time position where Victim 1 currently works.

As to the section of the email that reads, "Who was there in September when you were "devastated" romantically twice by another man (who was engaged to be married)?" Victim 1 reported that in September 2017, she had dinner with her co-worker (hereinafter known as "Co-worker") who was engaged to be married.  During the dinner, Victim 1 and Co-worker confessed to have feelings for each other; however, Co-worker told Victim 1 that he was in love with his fiancé and planned to marry her.  Victim 1 was devastated and confided in the defendant about what had occurred.

As to the section of the email that reads, "Remember when you spent your tax refund on me?" Victim 1 reported that in January 2015 or 2016, she received her tax refund early and used part of it to pay for dinner to celebrate the defendant's birthday.

As to the section of the email that reads, "Remember the Mariah Carey "Forever" song? You said forever and sent that song, and now you're saying never," Victim 1 reported that while they were dating, she told the defendant that the Mariah Carey song "Forever" was their song.

As to the section of the email that reads, "You broke up with your last ex right around his birthday, that's torture," Victim 1 reported that in 2014, she broke up with her ex-boyfriend one week after his birthday and later told the defendant about it.

As to the section of the email that reads, "I'm the person that you love, the same person that I was when you met me and fell in love.  That "felinlovee" is a reference to me, and you know that," Victim 1 reported that she no longer has an Instagram account called "fellinlove" and created

the account during the time she and the defendant were dating.  Victim 1 believes that "felinlovee" is in reference to her Instagram account, but it was misspelled.

Also on December 1, 2017, Victim 1 filed for a temporary protective order in Arlington General District Court in Virginia.

The December 1, 2017 email from nobody@remailer.paranoici.org contained the sender's IP address, 88.80.28.20, in the header information of the email.  An open source lookup of the IP address 88.80.28.20 revealed that it is associated the Swedish ISP provider, PeRiQuito AB (PRQ). PRQ is a globally known web hosting company that markets an anonymous platform to its clients for internet access.  PRQ clients have included WikiLeaks.

On December 8, 2017, the defendant was served with the temporary protective order.  That same day, on December 8, 2017, Victim 1's sister (hereinafter known as "Sister 1") received a text message from the defendant's cell phone number that read, "Hello, I'm trying to reach [Sister 1]" and "Hi [Sister 1], This is Brendon.  I'm trying to reach your parents to clear the air about some very important things."

On January 4, 2018, after the defendant appealed the protective order, it was denied due to a lack of evidence at the time directly tying the defendant to any harassing communication.  Many of the connections described above were discovered through FBI investigation after January 4, 2018.

On January 6, 2018, Victim 3 received a text message from an unknown email address mixmaster@hoi-polloi.org and the message read in part, "I know you're getting these messages." Victim 3 responded back to saying, "Didn't I tell you to stop messaging me."

The following day, on January 7, 2018, Victim 3 received text messages from an unknown sender identified as "Anonymous" from similar phone numbers that were each missing one digit.

The first text message was from phone number (410) 200-502 and read, "You don't need to answer actually.  The private investigator will give me all of her whereabouts and anyone she speaks to.  Continue tweeting your nonsense."  The second text message came from phone number (410) 100-003 and read, in part, "She is being watched for her own safety from the outside world.  Any husband would do that for their wife.  It's all completely above board and legal, so there's no need for you to get excited about it."  The third text message came from phone number (410) 200-503 and the message read in part, "Have her contact me, and you won't be needed . . . you think I want to be talking to you?  I don't care about you."  The same text message that Victim 3 received from phone number (410) 200-503 was also sent to her from email address mixmaster@hoi-polloi.org.  The fourth text message came from phone number (410) 200-504 and the subject of the message was "She lost, loser" and the contents read, "Guess you didn't hear, she lost lmao You wanna try the same route?  You'll get laughed out of there just like she did."  The abbreviation "lmao" is commonly used in text messages for "laughing my ass off."  Victim 3 then sent a text message to the defendant's AT&T cell phone number that said, "I'm going to ask you one last time to NOT send me any text messages from anymore anonymous apps and to stay off my social media.  This is consider harassment.  Leave me ALONE."  The defendant responded, "Again, who are you?  . . . You are anonymous . . . Troll . . . This is an awful prank, I hope you get well crazy person."  Victim 3 responded, "You're bored as hell and just mad you can not contact [Victim 1] anymore.  So your [sic] reaching out to her friends.  The judge is already aware of you doing this.  You have a file now.  So like I said CALL the police on me."  The defendant responded back to Victim 3, saying, "I can't contact her?  I thought my case was dismissed.  Do you know something I don't? . . . I have a file of a dismissed case by a scorned woman . . . Are you her lawyer?  I would go to

jail?  I thought that only applied with protective orders?  And, I don't have one.  Give me her number."  Victim 3 responded, "Hell no."

On January 16, 2018, the defendant was banned from all Virginia Tech facilities.  Victim 1 worked at Virginia Tech.  The defendant appealed the ban in writing stating, in part, "Due to the nature of my job at the Department of Education, I may need to visit one or more Virginia Tech facilities in the future.  This ban can have an adverse affect [sic] on my ability to fully perform my job."  According to the defendant's supervisor, the defendant would have no reason to visit, or need access to, any university or college campus to perform his work duties.

On January 28, 2018, Victim 1 received an email from an anonymous user through Guideposts.org, the website of a Christian magazine.  The message linked to an Instagram picture of the victim and read, "It's nice that you celebrated your mom's birthday recently.  Hopefully, you also remember to call others whose birthdays are coming up especially the ones who selflessly helped you when you were a mess many times.  That's what a decent person would do anyway.  You guys should post a new pic, I'd like that.  That pic is too blurry."  This communication was sent the week before the defendant's birthday.

On January 31, 2018, Sister 1 received an email from roxiehart@yahoo.com, sent through the College of Southern Maryland ("CSM") Directory with the message, "Hey [Sister 1], Be sure to tell [Victim 1] I said hi.  Have a good day now."  The IP address associated with the email sender was 178.20.55.18 and resolved back to a Tor exit node and the sender's true IP address is, therefore, untraceable.

On February 1, 2018, Sister 1 received an email from tryingto@aol.com that was also sent through the CSM Directory, which stated, in part, "You guys must want me to end up like Lana.  This is sick.  I'll have to do it at your sister's job so she can see it."  This appears to be a reference

to Sister 1's sister-in-law, Lana, who committed suicide.  During his relationship with Victim 1, the defendant had become aware of this information.  The IP address associated with the email sender was 163.172.223.200.  An open source lookup of the IP address identified it as a Tor exit node and the sender's true IP address is, therefore, untraceable.

CSM's directory http://directory.csmd.edu/ allows any user with access to the internet to navigate to this website and search for a recipient's name, recipient's email address and recipient's phone number and link on a hyperlink that allows a user to send an email directly to the recipient. An FBI agent performed a text message test on July 17, 2019, using the fake email address of 123@mail.com to send to a CSM employee's email account with the subject line and message content of "Testing[.]"  On the same day, the FBI agent confirmed with the CSM employee that she received the 'Testing' email to her CMS work email address, which appeared to have been sent by email address 123@mail.com.

Victim 1 filed another temporary protective order against the defendant in Arlington General District Court in Virginia and it was denied on February 7, 2018 due to a lack of evidence at the time directly tying him to any harassing communication.  Many of the connections described above were discovered through FBI investigation after February 7, 2018.

On February 25, 2018, Victim 1's supervisor ("Supervisor") received a text message from anonymous@foto.nl1.torservers.net with the message: "Be sure to tell [Victim 1] tomorrow that she can't run or hide."  According to its website, the domain Torservers.net is an independent network of foreign and U.S. based non-profit organizations that are known for operating servers with high network bandwidth and running them as Tor exit nodes.

On March 14, 2018, one of Victim 1's co-workers received the same text message three times to his cell phone number which came from three different email addresses;

nobody@remailer.paranoici.org, nobody@dizum.com, and anonymous@foto.nl1.torservers.net. The message read, "[Victim 1] tried to sleep with [Co-worker]. Ask them about the dates they had together." According to an open source search, Dizum.com is a Netherlands-based anonymous remailer.

On June 20, 2018, the mother of a coworker of Victim 1 received numerous anonymous text messages containing threats to Victim 1. One of these messages stated, "[Victim 1]'s life will come to an end. I have an extensive plan how I will hide in the backseat of her car and get her at the right time."

On August 4, 2018, Victim 1's best friend, Victim 3, reported that Victim 1 and Victim 3 were shopping together near Silver Spring, Maryland. As they exited one of the stores, Victim 3 saw the defendant walking past them in the opposite direction. Victim 1 and Victim 3 decided to leave the area immediately and began walking back to the parking garage where their vehicle was located. The defendant appeared, walking behind them towards the parking garage and was a short distance away from them when Victim 3 confronted the defendant and told him to stop stalking them. Victim 3 reported that the defendant then fled after "giving them the middle finger."

On August 5, 2018, Victim 3 received an email from noreply@anonymousemail.me with the message, "I should I [sic] went and got it real quick, I keep it with me now. I would have loved to put it to the side of your head and light your ass up." So far, law enforcement have been unable to find any record of the defendant owning a gun or having permission to carry one. However, according to the Maryland Automated Firearms Services System, the defendant's father owns a Ruger GP-100 Double Action .357 handgun, the defendant may have access to.

According to its website, the domain AnonymousEmail.me is a free secure online emailer, based in Bulgaria, which allows users to send unlimited emails anonymously for free without the need for registration.

On August 6, 2018, Montgomery County granted Victim 3's request for a temporary protective order against the defendant.  Victim 3 also reported the encounter with the defendant to the Montgomery County Police Department.

On September 27, 2018, Montgomery County overturned the temporary protective order following the defendant's appeal due to a lack of evidence at the time directly tying him to any harassing communication.  Many of the connections described above were discovered through FBI investigation after September 27, 2018.

In or around December 2018, another one of Victim 1's sisters (hereinafter known as "Victim 4") and Victim 4's co-workers began receiving anonymous emails and text message from an unidentified person. Victim 4 worked for a nonprofit advocacy organization located in Washington, D.C.

On December 12, 2018, Victim 4 and a co-worker received an email from mapagmahal@protonmail.com making sexual allegations about Victim 1 and stating, "People with morals like me call a girl like this a slut, and they would be correct.  [Victim 1] is a slut who uses people strictly for her own gain and pleasure.  She is a very sick person. … [Victim 1] is a bad person who lacks a soul."

On December 28, 2018, Victim 1's college newspaper received two emails from Direcholang@protomail.com stating that Victim 1 was a victim of sexual assault while attending college, and she plans to possibly sue the school.  In particular, the email stated that, "Though this happened years ago, Victim 1 is still very traumatized and continues to act out."

On December 28, 2018, two of Victim 4's co-workers received an email to their work email addresses from direcholang@protomail.com that described Victim 1 as a "ho, ho, ho," and went on to say:

> Her name is [Victim1's name] she lives at [Victim 1's address].  She is the daughter of [Victim 1's parents' names].  She has two full siblings [Victim 1's siblings' names] and one main half-sibling [Victim 1's sibling's name].  [Sister 1] lives at [Sister 1's address] with her two wonderful daughters [Sister 1's children]

The email then listed sexual activities allegedly tied to Victim 1.

On January 2, 2019, three of Victim 4's co-workers received the same email to their work email addresses from direcholang@protonmail.com, which referenced Victim 1 by name and the message read, "Actions have consequences, [Victim 4].  Your sister is going to learn that in a very hard way.  She thought she could just hurt as many people as she wanted, and she thought she could do what she wanted.  She has to pay, that's all there is to it.  She knows it, I know it, and God knows it."

On January 24, 2019, Supervisor received an email from ILoveGod34@protonmail.ch with the message, "Fuck [Victim 1].  She's a dirty bitch who has taken dick up her ass before.  I hope that bitch dies soon."

On March 3, 2019, Victim 4 and several of her co-workers received the same email message from noreply@clickitfuneralhome.com with the subject line, "Memory of Fran (Efrossiny) Hilborn."  The body of the email read:

> [Victim 1's full name]  Age 27 of White Plains, Maryland was gunned down.  She was born on July 25, 1991, to [Victim 1's parents' names].  She was a known hoe and homewrecker.  She tried to sleep with 3 men that she knew were in relationships.  She did this in college, grad school, and at her office.  No one will miss her.  May she burn in hell.

Starting on March 7, 2019, one of Victim 4's co-workers ("Victim 2") received a series of text messages with Victim 4's name in the subject line.  All of the texts were from phone numbers

he did not recognize that all came from area code 410, were missing a digit, and were labeled as having been sent from "Mike."

The first message read, "Does [Victim 4] work at [street and suite address of office in Washington, DC where Victim 4 works]?  What time does she get to work?"  Approximately three hours later, "Mike" wrote, "There's so many traitors out there, that's why traitors must be punished[.]"

The next night, on March 8, 2019, Victim 2 received a text message from "Mike" that read, "[street and suite address of office in Washington, DC where Victim 4 works.]"  This message was followed, nearly simultaneously, by a text message with Victim 4's name in the title that stated, "I feel like I have to hurt someone for people to take me seriously."  Approximately three minutes later, "Mike" wrote, "What time does [Victim 4] get to work in the morning?  I might need to wait for her either to arrive or leave."  Approximately ten minutes later, "Mike" sent more text messages that stated, "I have a pic of all the [Victim 4's employer's] workers.  I might need to talk to them before they enter the building.  I want to tell them how much I hate [Victim 1]."

On March 9, 2019, Victim 2 received a text message in the morning from "Mike" that contained only Victim 2's email address with Victim 1's name in the title.  That night, Victim 2 received three text messages within six minutes.  The texts said, "what to do, people aren't listening to me.  I might have to shoot the place up."  Then, "I'm tired of being treated like shit.  Somebody's got to die."  Followed by, "No one fucking listens!"  Approximately a half hour later, Victim 2 received a text message that read, "I have so much anger, [Victim 2]."  Shortly thereafter, Victim 2 received another text message that read, "[Victim 1] has to die."  Approximately an hour later, Victim 2 received another text message that read, "Many people have wronged me, I want to shoot

them all and their loved ones."  A little more than an hour after this, Victim 2 received another text message that read, "One way or another, I'm going to kill [Victim]."

Victim 2 continued to receive similar (and in some cases identical) text messages on March 10 (including one containing link with a photograph of Victim 4, Victim 2, and their colleagues), March 11, March 12, March 14, March 16, and March 17.

On March 11, 2019, because of the text messages Victim 2 received, the Executive Director closed the D.C. nonprofit office and told employees to work from home because of the concern that the unidentified person making the threats would show up at the office and start shooting people.  The Executive Director reported the threat to the DC Metropolitan Police Department and notified the office building's security to restrict building access.

On March 26, 2019, Victim 4 and Victim 2 received an email from cameronrezo@runbox.com with the message, "[Victim 1] does not take responsibility for her actions.  She tries to act like I'm the bad person, she's evil and a slut.  I hate that bitch [Victim 1]!  Ahhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhhh".

On March 27, 2019, Victim 4 received an email from support@everloved.com that was titled "[Victim 1]'s Obituary" and the email stated "[Victim 1]: July 25, 1991 – July 24, 2019" and contained a link to a memorial page for Victim 1.  Ever Loved, Inc. is an online company that assists individuals in making funeral plans for their deceased, connects them to funeral providers, and host obituary webpages created by their users at a low cost.  The memorial page that was emailed to Victim 4 had the correct birthday for Victim 1, a fact the defendant had learned during the course of his relationship with her.

On March 30, 2019, Victim 2 received a similar text message from godlover82@protonmail.com with the message "[Victim 1]'s Obituary, Join us in this celebration,

[Victim 1], July 25, 1991 - July 24, 2019, [Victim 1]'s memorial website can be found here: https://everloved.com/life-of/[Victim 1]-white-plains-md-usa/."

According to Ever Loved, on March 27, 2019, a user signed up for Ever Loved with the email account godlover82@protonmail.com.  The user provided the name "Robert Marks."  On the same day, godlover82@protonmail.com created a memorial for Victim 1 with the associated URL of https://everloved.com/life-of/[Victim 1]-white-plains-md-usa/.  The user listed the deceased's (Victim 1's) location as White Plains, Maryland.  The user's IP address was 2c0f:f930:0:3::221.  An open source lookup of the IP address revealed that the IP address 2c0f:f930:0:3::221 resolves back to the IP Address 197.231.221.211, which is a Tor exit node and the user's true IP address is, therefore, untraceable.

On April 2, 2019, Victim 4 and Supervisor, received an email from cameronrezo@runbox.com with the subject: "[Victim 1]-My Rap Skills" and the message:

> Traitors all around me, They wanna down me, Put that gun in their face, There won't be a case, I'll deliver them to the river, Tie 'em down with a weight, All my bullies will finally see the cool me Sometimes I sit and stare at the wall because no one will give me a call All my enemies will fall, my raps are so raw.

Runbox is a secure anonymous email company located in Norway.

On April 13, 2019, Victim 1 received an email from godlover82@protonmail.com with the subject: "I'm Going to Kill you, [Victim 1]" followed by the message, "I'm going to kill you, [Victim 1]."

Also on April 13, 2019, Victim 1 and Victim 2 received an email from godlover82@protonmail.com with the message: "Hey [Victim 1], Always remember when you're getting this payback and your punishments from me, you did this to yourself.  You chose the devil while I chose God.  I have morals, you don't[.]"

On April 20, 2019, Victim 2, Victim 4, and a friend of Victim 1's sister received identical emails from godlover82@protonmail.com with the subject: 'The Death of [Victim 1]' and the message read:

> My current plan is to kill [Victim 1] on July 24th of this year. I am still considering what I will use as the murder weapon. I don't want her to reach the age of 28. You can save this email for that time. You can't save her anyway. If God allows me to take her life, then it shall be done.

On May 20, 2019, an unidentified person placed a 30-day hold on mail delivered to Victim 1's parent's home address from May 22, 2019 to June 21, 2019. According to U.S. Postal Service records, the unidentified person that requested the hold provided Victim 1's father's name. The IP address 217.115.10.132 was associated with the request. An open source lookup of the IP address came back to a Tor exit node. During their relationship, the defendant visited Victim 1's parent's home and was familiar with their names and address.

On June 6, 2019, another one of Victim 1's co-workers received an email to her work email account from godlover82@protonmail.com. The subject of the email was "Sinners Must Die" and the message read, "If you have ever fornicated, you are a sinner. If you have committed adultery, you are a sinner, and so on and so forth. I can't take seeing people sin, I loathe sinners! I need to do something about it." According to ProtonMail records, during the time the email was sent, the godlover82@protonmail.com user was logged into the godlover82@protonmail.com email account and connected to a Tor IP address.

On June 26, 2019, while walking back from a lunch break to her new job, Victim 3 encountered the defendant on the street. The defendant was walking alone. They passed each other near Union Station in Washington, DC and made eye contact but did not speak. Victim 3 waited until the defendant was some distance away before she walked into her office building in

order to avoid the defendant discovering where she worked.  The defendant and Victim 3 work in office buildings in Washington, D.C. approximately two blocks from each other.

On July 1, 2019, Victim 3 received an email to her personal email account from godlover82@protonmail.com with the message, "Hey, You know who you are, [abbreviation of organization's name where Victim 3 works].  Walking on the other side of the street doesn't mean I can't see you.  I didn't really like your dress today, it had too many colors."  Victim 3 reported that on the same day she received the email, she was wearing a colorful navy blue dress with red flowers and walking on the opposite side of the street in Washington, D.C. from where she had previously observed the defendant.

Victim 3 reported the threats that she had been receiving to her work supervisors and they agreed not to put any of Victim 3's information on the organization's website.  However, Victim 3 conducted a public source search of her name and discovered her name, new job title, and contact information was posted on the website www.zoominfo.com.  Victim 3 contacted the company and requested that her information be taken down from its website.  Zoominfo agreed and immediately took it down.  ZoomInfo is a subscription-based software as a service company that sells access to its database of information about business people and companies to sales, marketing, and recruiting professionals.

On July 2, 2019, Victim 1's sister [hereinafter referred to as "Sister 3"], Victim 3, and Victim 1's co-worker, received an email from godlover82@protonmail.com that read,

> I'm tired of people trying to use me, this world is evil.  I will continue to fight this evil world.  If I want to use violence to get my point across then so be it.  You people will not listen to me until I'm waving a gun around.

A few minutes after this email, Victim 3 and Sister 3 received another email from godlover82@protonmail.com with the message, "I don't care if I have to do life in prison, if God wants me to kill [Victim 1], I will do it."

19

On July 7, 2019, Victim 3 received an email at her new work address from godlover82@protonmail.com with the subject line, "Scary!"  In the message was a link to a YouTube video, https://youtu.be/WP9okjYzUWU?t=313, that tells the story of Peggy Klinke who was stalked for years and, despite moving out of state and frequently seeking law enforcement assistance, was ultimately shot to death by her ex-boyfriend Patrick Kennedy during a 2003 murder-suicide.  The video describes how Mr. Kennedy was able to locate and kill Ms. Klinke, with the help of a private investigator, even though he was on release pending trial for crimes against Ms. Klinke at the time of the murder.

On July 18, 2019, Victim 3 received an email to her personal email account from godlover82@protonmail.com and the message read, "Target #3 was wearing an all black outfit with a black purse."  Victim 3 reported that on the same day she received the email, she wore an all-black outfit to work.

On July 20, 2019, a Pen Register Trap and Trace was initiated on the defendant's home internet line and a search was initiated on the defendant's cellphone geolocation.

On July 20, 2019, the defendant's home internet line showed internet traffic to TOR2WEB between 2:31 PM and 4:05 PM. Geolocation information from the defendant's cellphone indicated that the defendant's cellphone was in the vicinity of his home address at the time.  TOR2WEB is software that facilitates access to the Dark Web, specifically to web sites hidden behind Tor.

Also on July 20, 2019, activity on the defendant's home internet line showed internet traffic to Privax LTD between 2:31 PM and 3:47 PM. Geolocation information from the defendant's cellphone indicated that his cellphone was near his apartment at that time.  The defendant's home internet traffic also showed online traffic to Privax LTD between 10:02 PM and 10:09 PM.  The internal light from the defendant's apartment was consistently visible in video surveillance from

during that time.  Privax LTD is the parent company of HideMyAss!, a service that facilitates anonymous internet access.

During the course of the investigation, law enforcement and Victim 1 discovered the website ihate[Victim 1]11.tumblr.com.  This site publicly showed a photograph of Victim 1, an address associated with Victim 1, and the statement "Wanna meet?"

During the course of the investigation, law enforcement and Victim 1 also found a website fuck[Victim 1].tumblr.com.  This site states in part "R.I.P [Victim 1] (1991-2019)."  It also publicly listed an address associated with Victim 1.

According to ProtonMail's records, the godlover82@protonmail.com account was created on January 26, 2019.  All of the IP addresses associated with the login history for godlover82@protonmail.com were Tor exit nodes and the true IP address of the sender was, therefore, untraceable.

According to ProtonMail, account ILoveGod34@protonmail.ch was created on January 17, 2019 and last accessed January 24, 2019.

From November 2017 to present, over 30 individuals linked to Victim 1 have received a total of at least 400 harassing and threatening messages and/or online posts from an unidentified person.  Although these messages and posts often come from different sources, their tone, language, and contents are consistent, particularly in that they almost always directly reference Victim 1 in some way.  Almost all of these messages are unsigned or use apparently assumed names, however, some make reference to Victim 1 having slept with the writer's fiancé, often providing details similar to those relating to the allegations concerning a relationship between Victim 1 and Co-worker (*See, e.g.,* page 5 and 7).  At present, Victim 1, Victim 1's parents, Victim 1's siblings, Victim 1's friends, and even Victim 1's family's co-workers continue to receive

threatening messages, which are all linked to Victim 1.  Victim 1 and her siblings have also received a high volume of unsolicited catalogs concerning sex or firearms by mail at their places of work and home addresses.  Some of these catalogs are addressed to "[Victim 1 first name] Countdown [Victim 1 last name]" and "[Victim 1 first name] Payback [Victim 1 last name]."  The members of Victim 1's family have also received numerous anonymous automated phone calls.

Victim 1, Sister 1, and Victim 3 all filed for temporary protective orders against the defendant on separate occasions stemming from direct threats and harassments they had received. All of the protective orders were denied due to a lack of evidence at the time, after the defendant challenged them.

After November 2017, the threats and harassment are consistently done in ways to hide the true identity and the location of the sender, although the nature and content of the messages makes clear they are all from the same sender, the defendant.  For example, Textforfree, the company associated with the website www.textforfree.net, gave records that showed approximately 121 text messages sent to Victim 1 or an individual linked to Victim 1 from their website.  The website-based text messages sent between November 29, 2017 and September 5, 2018 were submitted after the user logged in through the Tor network or another comparable proxy based obfuscation site. Thus, the original source of the transmissions is effectively untraceable.

Similarly, to further hide the sender's identity and location, the threats and harassment were often sent from email accounts from foreign and obscure email providers.  In addition to Anonymousmail.me (Bulgaria) and ProtonMail (Switzerland), which have been described above, Runbox is a free online email provider that is located in Oslo, Norway.

On July 23, 2019, Special Agents from the Federal Bureau of Investigation Washington Field Office executed arrest and search warrants at the defendant's home in Hanover, Maryland.

At approximately 5:05 pm, pursuant to a "no knock" clause in both warrants, the agents unlocked the door and entered the residence. The defendant, who was in the entryway/bathroom area, called out, "hello?" to which the agents responded by stating, "FBI, don't move." The defendant began to retreat, walking backward, with his hands up, through the bathroom and bedroom, into a living room. Once there, the defendant turned away, running, and lunging toward a gray laptop on a couch, deliberating shutting the computer and clutching it to his chest. Agents seized the laptop and then attempted to handcuff the defendant, who continued to struggle and was non-compliant. A subsequent search of the apartment revealed numerous scraps of paper, some of which contained notes with usernames and passwords.

## Principles Governing Requests for Detention

The Bail Reform Act, 18 U.S.C. § 3142, provides for pretrial detention where there is "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C.Cir.1987). The Act provides for pretrial detention where the defendant is charged with a "crime of violence," 18 U.S.C. § 3142(f)(1)(A) and where there is a "a serious risk that [the defendant] will obstruct or attempt to obstruct justice, or threaten . . . or intimidate, or attempt to threaten . . . or intimidate, a prospective witness[,]" 18 U.S.C. § 3142(f)(2)(B).

The Act requires the Court to consider four factors in resolving a motion for pretrial detention: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

When community safety is the basis for detention, the government must prove the need for detention by clear and convincing evidence. *United States v. Smith*, 79 F.3d 1208, 1209-10 (D.C. Cir. 1996).

## The Factors Supporting Detention

The government respectfully submits that each of the four Bail Reform Act factors weighs in favor of detention, and supports the government's contention that no condition or combination of conditions can reasonably assure the safety of the community and the defendant's appearance at trial, and that the defendant presents a serious risk of obstruction of justice.

1. Nature and Circumstances of the Offense Charged

The nature and circumstances of the offense weigh heavily in favor of detention. Both 18 U.S.C. §§ 875 (Internet Threats) and 2261A (Stalking) are crimes of violence. In addition, the defendant faces significant jail time for serious offenses that posed a threat to the safety of the community and included a pattern of trying to hide his illegal activity through sophisticated means.

Both 18 U.S.C. §§ 875 (Internet Threats) and 2261A (Stalking) are crimes of violence. However, because the defendant is charged with multiple crimes, only one of the charged statutes needs to be deemed a crime of violence to justify detention pursuant to 18 U.S.C. § 3142(f)(1)(A). For the purposes of the Bail Reform Act ("BRA"), and as applicable here, a crime of violence is defined as an "offense that has as an element the use, attempted use, or THREATENED use of physical force against the person or property of another" or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *See* 18 U.S.C. § 3156(a)(4) (using the same definition found at 18 U.S.C. § 16(a))(emphasis added); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1256 (2018) ("Section 16(a) covers offenses that have the use, attempted, or threatened

use of physical force 'as an element.'"); *United States v. Haight*, 892 F. 3d 1271, 1280 (D.C. Cir. 2018) (noting that a violent felony will be found where, like under § 16(a), a prior conviction, "has as an element the use, attempted use, or threatened use of physical force against the person of another").

### a. *18 U.S.C. § 875 is a Crime of Violence*

As noted above, under the BRA, a threat to use physical force against a person is a crime of violence.  875(c) provides:

> Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

875 specifically covers a threat to injure the person of another, which is a threat to use physical force against another person.  *See U.S. v Santoro*, 359 F. Supp. 3d 122 (D. Maine Jan. 24, 2019)(finding that 875(c) is  crime of Violence because "a threat to injure is a threat to use physical force") (citing *United States v. Chapman*, 866 F.3d 129, 134-35 (3rd Cir. 2017) (finding that 876(c), a threat to injure sent through the postal mail is a crime of Violence)).

Based on the foregoing, 18 U.S.C. § 875(c) constitutes a crime of violence and therefore gives rise to a basis for detention pursuant to 18 U.S.C. § 3142(f)(1)(A).

### b. *18 U.S.C. § 2261A is a Crime of Violence*

Under the BRA, an offense that "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" is a crime of violence.  Under 2261A:

> Whoever—
>
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or

electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—

(A) places that person in reasonable fear of the death of or serious bodily injury to a person described in clause (i), (ii), or (iii) of paragraph (1)(A);

...

shall be punished as provided in section 2261(b) of this title.

Multiple courts have found that stalking under 2261A, "the intent to 'kill, injure, harass ... or cause substantial emotional distress,' … naturally involved a substantial risk of physical force." *See United States v. Grooms*, No. 3:15-MJ-00025, 2015 WL 1982097, at *3 (S.D.W. Va. Apr. 29, 2015) (quoting *United States v. Shrader*, No. 1:09–cr–00270, 2010 WL 503092, at *3 (S.D. W.Va. Feb. 8, 2010)) (citing *United States v. Neuzil*, No. 09–CR–2020–LRR, 2009 WL 2030373, at *2 (N.D. Iowa July 13, 2009); *United States v. Moonda*, 347 F.App'x 192, 201 (6th Cir. 2009)(2261A is a crime of violence for the purposes of 18 U.S.C. § 924(j))).

Furthermore, as the court in *Grooms* noted:

The legislative purpose behind 18 U.S.C. § 2261A(2)(A) certainly indicates congressional intent that offenses under this section be considered crimes of violence for purposes of holding a detention hearing.  Section 2261A(2)(A) was created as part of the Violence Against Women Reauthorization Act of 2005, Public Law 109–162, federal legislation specifically intended to address the problem of domestic violence and reduce violent crimes against women.  Acknowledging the sobering statistic that nearly one third of American women report physical or sexual abuse by a husband or boyfriend at some point in their lives, the Act implicitly recognizes that stalking and cyberstalking are crimes of violence, like sexual assault, domestic battery, and dating violence, which require the appropriation of funds for the creation of hotlines, education, training, prosecution, and punishment.

*Grooms*, 2015 WL 1982097, at *5.

c.   *The Defendants Charged Conduct Weighs in Favor of Detention*

The defendant has been charged with three counts of 18 U.S.C. § 875 (Internet Threats), each against a different person, and three counts of 18 U.S.C. § 2261A (Stalking), each count also

against a different person.  There is some overlap between the victims of the two charges, but the defendant is charged with committing violent felonies against four different people.  The crimes began after Victim 1 broke up with the defendant and cut off contact, but it is important to note that the defendant expanded the scope of his crimes to include not only the victim's sisters and best friend, but also people who worked with Victim 1's sister and may not even have known that Victim 1 existed until they were dragged into the defendant's web of threats and harassment.

Moreover, the defendant is not only charged with stalking and threats conducted over the internet, but the defendant also personally stalked and harassed Victim 1 at work, including by trying to force his way into her car, and stalked Victim 3, repeatedly letting her know that he was watching her by commenting on her location and clothing.

The severity of the defendant's conduct is likewise demonstrated by the response it required from the FBI and the company that employs Victims 2 and 4.  His behavior was so concerning that on March 11, 2019, the company that employs Victims 2 and 4, closed down their offices and told their employees to work from home to avoid a possible mass murder.  The risk created by the stalking and threats offenses required the FBI to assign a team to continuously surveil the defendant and to monitor Victim 1 for the period surrounding the day before her birthday, the date on which he repeatedly threated, to numerous people on multiple occasions, to kill her.

Finally, in considering the nature and circumstances of the offense, the Court should also weigh the penalty the defendant faces upon conviction.  *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990).  As noted above, in this case the defendant faces a statutory maximum of up to 20 years in prison.

2.  <u>The Weight of the Evidence</u>

The weight of the evidence against the defendant is substantial, and weighs heavily in favor of detention.  Throughout the defendant's course of conduct, and despite his sophisticated use of anonymity tools and techniques, the defendant more than once inadvertently identified himself as the perpetrator of a threatening message or stalking behavior by using anonymous accounts that could be tied back to the defendant (such as by creating an anonymous phone number with Burner and then registering it using his real cell phone number) or by responding in a way that acknowledged his role and identity (such as by referencing his successful defense against a protective order or by referencing incidents from the defendant's history with the victim). Throughout the entire period during which the defendant threatened and stalked the victims, the defendant followed a consistent pattern of behavior and showed deep personal knowledge of Victim 1's family and personal history.  The pattern of behavior, in addition to consistently expanding his web of victims and always tying them back to Victim 1, also included a consistent use of sophisticated online tools to hide himself from discovery.

The strength of the evidence on the charges against the defendant is further confirmed by the recovery of the notes and electronic evidence from the defendant's residence.  That evidence included a bookmark on his phone that, incorrectly, indicated that law enforcement could not use biometric means such as fingerprints to get into a suspect's electronic devices.  The defendant had set up his phone to use his fingerprint and expressed surprise when agents opened his phone using his thumbprint.  That, especially when paired with the defendant's response when confronted with the FBI search team reflects a significant consciousness of guilt and willingness to obstruct justice.

3.   <u>History and Characteristics of the Defendant</u>

The defendant's history and characteristics favor detention.  Although the defendant has no known criminal history, the characteristics that he displayed through his campaign of threats and stalking show that he cannot be released.  The defendant has shown a single minded focus on Victim 1 since November 2017, constantly and regularly threatening and harassing Victim 1 multiple times a week and sometimes multiple times a day.  When Victim 1 hid from the defendant by moving, blocking him from contacting her, and changing her contact information, he consistently pursued her through her friends and family in an ever-widening circle as each of them also tried to cut off his access to them.  The defendant has also stated that he does not fear the consequences of his threats and is willing to risk jail or even death to harm his victims.

The defendant appears to consider his campaign of threats and harassment as a righteous almost religious quest, justifying his acts.  He used anonymous email accounts called "godlover82" and "ILoveGod34."  His threats include statements that "If God allows me to take her life, then it shall be done," "Sinners Must Die," "if God wants me to kill [Victim 1], I will do it," "You chose the devil while I chose God," and "this world is evil.  I will continue to fight this evil world.  If I want to use violence to get my point across then so be it."  He also stated his belief that Victim 1 "is a bad person who lacks a soul."  The defendant also does not appear to care who else gets hurt in his quest, repeatedly threatening other people, even random civilians who he does not even know.

4.   <u>The Nature and Seriousness of the Danger to Any Person or the Community</u>

The nature and circumstances of the dangers posed by release also weigh heavily in favor of pretrial detention.  The defendant is charged with crimes that have already harmed a significant number of people.  His conduct evinces a privileged belief that he is above the law or beyond its

reach.  In particular, the defendant has repeatedly threatened to kill Victim 1, with those threats escalating in frequency and intensity in the last four months.  The defendant explicitly threatened to kill Victim 1 on June 20, 2018, and March 9, April 13, April 20, and July 2, 2019.  In the April 20th threat, the defendant said that he would kill Victim 1 on July 24th, because it was the day before her birthday.  The defendant also created multiple *in memorium* sites on funeral parlors' web pages showing that Victim 1 would die on July 24, 2019, the day before her birthday.  He repeatedly refers to his "plan" to kill Victim 1.  In particular, in the June 20, 2018 threat, the defendant said that he had "an extensive plan" involving hiding in her car to kill her.  The defendant amplified his message using third parties, registering Victim 1 and her family for catalogs and email lists, on occasion placing terms such as "payback" and "countdown" as Victim 1's middle name on these items as a way to remind her of his prior communications.

In addition, the defendant threatened to "shoot up" the place where Victims 2 and 4 worked and to shoot all of the people who the defendant thinks have wronged him "and their loved ones." On July 7, 2019 the defendant sent Victim 3 a video that tells the story of Peggy Klinke, who was stalked for years by an ex-boyfriend and, despite her attempts to leave the area and hide from him, he located her with the help of a private investigator and killed her while he was on pre-trial release. The defendant here has repeatedly told his victims that he has retained a private investigator who is watching Victim 1.

## Conclusion

The defendant committed serious crimes, attempted to obstruct justice with respect to those crimes, and then planned to commit additional serious crimes.  The government respectfully submits that, in this context, without pretrial detention, no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of any other person and the

community, including from the destruction or criminal distribution of evidence or information belonging to Members of the Congress or other victims in this case.

For all of the foregoing reasons, the government respectfully submits that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, including with respect to the integrity of the investigation and trial from further criminal conduct and obstruction of justice.  The government therefore requests that the Court order that the defendant be detained pending trial.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By: _____/s/_____
Andrew Floyd, DC Bar No. 1023315
Peter V. Roman, DC Bar No. 984996
Assistant United States Attorneys
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C.  20530